**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MAINE**

Walesca Rodriguez, and                                    Civil Action No.
Richard Rivera,

       Plaintiffs,

v.

Worcester Wreath Company,
Worcester Resources, Inc.,
Worcester Holdings, LLC,

       Defendants

---

## COMPLAINT

---

Plaintiffs Walesca Rodriguez and Richard Rivera bring this discrimination and retaliation action against Worcester Wreath Company ("Worcester Wreaths"), Worcester Resources, LLC ("Worcester Resources"), Worcester Holdings, LLC ("Worcester Holdings," with Worcester Wreath and Worcester Holdings, the "Worcester Defendants") to seek redress for Defendants' offensive harassment and retaliatory termination and eviction they suffered at the Worcester Defendants' dormitory in Harrington, Maine. Plaintiffs Walesca and Richard seek to ensure that other seasonal workers in Maine are not similarly mistreated, harassed, fired and ultimately thrown out into the street on a moment's notice based upon the whims of their employers.

### Summary of the Action

1.     Every year, Walesca Rodriguez and Richard Rivera make the long journey from their homes in Puerto Rico to job sites in Down East Maine to work in iconic industries—including blueberry and potato cultivation, seafood harvesting and processing, and wreath making—that give Maine its distinctive identity. Over the years, Walesca and Richard have gained hard-earned

reputations as good workers, coveted by employers seeking help in these difficult, seasonal, labor-intensive industries.

2.      Walesca and Richard's experiences in these iconic Maine industries were overwhelmingly positive. That changed dramatically in the fall of 2018, after they and others were recruited to work a seasonal job assembling wreaths for the Worcester Wreath Company in its Columbia Falls factory. They were given employer-provided housing by the Worcester Defendants in Harrington, Maine.

3.      Shortly after Walesca and Richard arrived, a Worcester Wreaths crew chief, Damien Mejia, began making aggressive, unwanted sexual advances toward Walesca and other women, both at the Columbia Falls factory and in the Harrington housing facility.

4.      Mr. Mejia's harassment continued despite clear requests to stop from Walesca and other women. Richard attempted to intervene on their behalf. Nonetheless, Mr. Mejia's harassment continued.

5.      Mr. Mejia also directed his ire at men who would not join him in a conspiracy to harass their female co-workers. When Richard refused Mr. Mejia's request for help in having sex with women Richard worked with, Mr. Mejia first offered to pay him more if he would change his mind and then threatened to have him fired.

6.      The harassment only escalated in the face of Walesca and Richard's opposition to Mr. Mejia. On Saturday, November 10, 2018, Mr. Mejia physically assaulted one of their co-workers, a woman named Karen, when she would not submit to his sexual advances. Walesca and Richard provided protection and support to Karen and other women frightened by Mr. Mejia's behavior.

7.  The Worcester Defendants failed to support Walesca and Richard for opposing Mr. Mejia's terrorizing, discriminatory behavior. Instead, Walesca and Richard, and several of their co-workers, were fired by Brianna Mejia-Bouchard, agent of the Worcester Defendants, the very morning after Mr. Mejia assaulted Karen. The Worcester Defendants also forcibly evicted them from their housing without any notice. Thousands of miles from home, they were rendered immediately homeless, dependent on the kindness of others to even leave the Worcester Defendants' property and find shelter for the night.

8.  The actions by the Worcester Defendants and its agents, joint employers and/or partners in an integrated enterprise, including Mr. Mejia and Ms. Mejia-Bouchard, were not only cruel, but illegal and discriminatory.

9.  The Maine Human Rights Commission ("MHRC") investigated Walesca and Richard's complaint, and, after an investigatory conference and hearing before the Commissioners, confirmed Plaintiffs' factual account of the harassment, termination and eviction they faced. The MHRC further issued a finding of reasonable grounds to believe that: (i) Mr. Mejia interfered with Walesca and Richard's Maine Human Rights Act ("MHRA") protected rights in violation of the MHRA; (ii) Ms. Mejia-Bouchard discriminated against Walesca on the basis of sex when she was subjected to hostile work environment; and (iii) Ms. Mejia-Bouchard unlawfully retaliated against Walesca and Richard in violation of the Whistleblowers Protection Act ("WPA") and the MHRA.

## PARTIES

10.  Plaintiff Walesca Rodriguez is a resident of Yauco, Puerto Rico.

11.  Plaintiff Richard Rivera is a resident of Sabana Grande, Puerto Rico.

12.  Defendant Worcester Wreath Company is a Maine corporation with principal business address of PO Box 214, 1013 North Street, Harrington, ME 04643.

13.     Defendant Worcester Resources Inc. is a Maine corporation with a principal business address of 394 U.S. Highway 1, Columbia Falls, ME 04623.

14.     Defendant Worcester Holdings, LLC is a Maine corporation with a principal business address of 125 Pit Rd., Columbia Falls, ME 04623.

## JURY TRIAL DEMAND

15.     Under Fed. R. Civ. P. 38(b), Plaintiffs demand trial by jury on all issues triable by a jury.

## JURISDICTION AND VENUE

16.     This action arises under the Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*., Title VIII of the Civil Rights Act of 1968, 42 U.S.C. § 3601 *et seq.*, the Maine Human Rights Act, 5 M.R.S. §§ 4551-4634, 14 M.R.S. § 6014, and the Maine Whistleblowers' Protection Act, 26 M.R.S. §§ 833. This Court has subject matter jurisdiction over Plaintiffs' federal claims under 28 U.S.C. §§ 1331 (federal question) and 1343 (civil rights), and supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

17.     Venue is proper in the District of Maine under 28 U.S.C. § 1391(e)(2) because: (i) Defendants operate in Maine; and (ii) under 42 U.S.C. § 2000e-5(f)(3), the unlawful employment and housing practices that are the basis of the Complaint are alleged to have occurred entirely in Maine.

## WALESCA AND RICHARD ARE RECRUITED TO WORK FOR THE WORCESTER DEFENDANTS

18.     In or around 2015, Walesca came to Maine for the first time to work a seasonal job picking blueberries and working in the receiving department making boxes for Wyman's of Maine.

19.     Between 2015 and 2018 Walesca traveled to Maine in most years to work a variety of jobs as a seasonal worker, including jobs in the blueberry industry and the potato industry.

20.     Richard first came to Maine to work a seasonal job in the blueberry fields in 2009 and has in the years prior to 2018 worked other agricultural, warehousing, production and assembly line jobs.

21.     Walesca and Richard are close friends. They often travel to migrant labor jobs together and work alongside one another.

22.     In fall 2018, Walesca and Richard were working in Northern Maine cleaning and sorting potatoes.

23.     Near the end of the potato season, on or around October 21, 2018, Defendant Brianna Mejia-Bouchard approached Richard. Over the years, Richard had interacted with Ms. Mejia-Bouchard's husband, Defendant Damien Mejia (with Ms. Mejia, the "Mejias").

24.     Mr. Mejia is a Latino man who is originally from Honduras. Ms. Mejia-Bouchard is a white woman who is originally from Maine.

25.     Ms. Mejia-Bouchard told Richard that she had heard Richard and Walesca were good workers and asked if they wanted to come work for Defendant Worcester Wreath Company in the coming wreath-making season.

26.     Ms. Mejia-Bouchard offered Richard and Walesca a job in a Worcester Wreath factory in Columbia Falls, Maine (the "Worcester Factory") starting just a few days later. Ms. Mejia-Bouchard further promised them housing in a facility maintained by Defendant Worcester Holdings in Harrington, Maine (the "Worcester Dormitory").

27.     Ms. Mejia-Bouchard indicated that Walesca and Richard would be working for the Worcester Factory, but would report directly to Ms. Mejia-Bouchard and Mr. Mejia and receive payment from them.

28.     No one explained or otherwise informed Walesca and Richard that Ms. Mejia-Bouchard and Mr. Mejia were contractors for the Worcester Defendants, nor that there was any substantive difference between being employed directly by the Worcester Defendants or being employed by the Worcester Defendants through the Mejias.

29.     Walesca and Richard believed at all times that they were being recruited to work directly for Worcester Wreaths.

30.     Walesca and Richard discussed the offer and each decided to take the job.

**WALESCA AND RICHARD ARRIVE AT THE WORCESTER DORMITORY**

31.     Walesca and Richard traveled to the Worcester Dormitory on October 23, 2018. The Worcester Dormitory was very large and housed about 60 people.

32.     Shortly after Walesca and Richard arrived, at about 4 or 5pm, Ms. Mejia directed Walesca to a large common dorm room and told her she would be staying there. Everyone else staying in the large common dorm room was a man.

33.     The Worcester Dormitory had certain rules posted and promulgated by the Worcester Defendants.

34.     Walesca noticed that there were more private side rooms available, each with just a few beds. After Richard returned from a shopping trip, the two of them approached Mr. Mejia together and asked if the two of them and their friend Miguel Jesus Diaz could move into one of the more private side rooms.

35.     Mr. Mejia approved the move but told them that a woman named Jane (later identified as Jane Ahrens) would have to sign off on it.

36.    At the time Walesca and Richard were not told that Ms. Ahrens was the representative for the Worcester Defendants at the Worcester Dormitory. They never met Ms. Ahrens until their termination and eviction.

37.    Walesca and Richard interacted only with Mr. Mejia and Ms. Mejia-Bouchard at the Worcester Dormitory. They believed that Mr. Mejia and Ms. Mejia-Bouchard were employed by and acted on behalf of the Worcester Defendants, just like other supervisors they encountered at the Worcester Dormitory.

38.    Walesca and Richard moved into one of the side rooms, designated as Room #1, that evening. They later received word from a Worcester Wreaths security guard that was present in the Worcester Dormitory that Ms. Ahrens had signed off on the room switch.

39.    Shortly thereafter, Richard overheard Damien receiving instructions directly from Morrill Worcester regarding the scheduling and tasks to be assigned to the newly recruited workers, including Walesca and Richard.

**WALESCA AND RICHARD BEGIN WORK AT THE WORCESTER FACTORY**

40.    Walesca and Richard began work at a Worcester Factory the next morning, on Wednesday, October 24. The Worcester Factory in Columbia Falls was about 20 minutes away from the Worcester Dormitory.

41.    There were about 100 other people working at the Worcester Factory. About 30 of the workers reported to Mr. Mejia. The rest of the workers reported to about four or five other crew chiefs. All of those workers were coordinated in a single enterprise controlled by the Worcester Defendants preparing wreaths regardless of who directly supervised them.

42.     Walesca worked on the second floor of the Worcester Factory. Walesca's job at the Worcester Factory was to assemble wooden boxes that others in the Worcester Factory packed wreaths into for shipment.

43.     Richard's job at the Worcester Factory was to pack balsam fir branches into boxes that others in the Worcester Factory used to assemble wreaths.

44.     Walesca and Richard worked alongside each other on many days. Richard would pack branches into the boxes assembled by Walesca, boxes which were then sent down to the first floor of the Worcester Factory where the wreaths themselves were constructed.

45.     Workers from all different parts of the Worcester Factory, including those ostensibly working under other supervisors, used the branches Richard packed into boxes to make wreaths, and packed wreaths into the boxes Walesca fabricated.

46.     Walesca was directed how to do her work, assembling boxes, by the son of Mr. Morrill Worcester. After that, Walesca showed other workers how to assemble boxes.

47.     Walesca and Richard worked from approximately 7 a.m. to 4:30 p.m. every day except Sunday.

48.     There was a whistle in the Worcester Factory that would announce breaks. Most workers took their breaks at the same time.

49.     Once they began their work, Walesca and Richard only saw Ms. Mejia-Bouchard when they were receiving their pay once a week on Fridays.

**MR. MEJIA BEGINS TO SYSTEMATICALLY HARASS WALESCA**

50.     On Sunday, November 4, 2018, Mr. Mejia approached Walesca in the kitchen at the Worcester Dormitory, where he was also living.

51.     To Walesca's shock and disgust, Mr. Mejia told Walesca he wanted her to come to his room and have sex with him.

52.     Walesca told Mr. Mejia she was not interested and asked him to stop talking that way to her. She also informed Mr. Mejia that she was gay and that she did not sleep with men.

53.     Mr. Mejia asked Walesca to have sex with him several more times during the conversation. Walesca repeated her request that Mr. Mejia stop accosting her or talking to her in a sexual way.

54.     After the conversation ended, Walesca felt sick to her stomach.

55.     Walesca went to the room she shared with Richard and Miguel and closed the door behind her. She did not, at this time, tell Richard and Miguel about what Mr. Mejia had said.

56.     About five or ten minutes later, Mr. Mejia came to the room and opened the door without knocking, on the pretense that he wanted to talk to Richard and Miguel about whether they knew anyone else who was looking for work.

57.     Mr. Mejia had never opened this door without knocking before. He did so for the first time just five or ten minutes after the end of a conversation when he aggressively, repeatedly propositioned Walesca to have sex with him. It was clear to Walesca that Mr. Mejia was trying to send her a message and intimidate her.

58.     Walesca felt intimidated and in fear for her safety.

59.     Walesca told Mr. Mejia not to open the door again without knocking.

60.     The next morning, on November 5, 2018, Walesca told Richard what Mr. Mejia had done the night before.

61.     Shortly thereafter, Richard confronted Mr. Mejia before work and told him that he had made Walesca extremely uncomfortable by making unwelcome sexual advances toward her. Richard urged Mr. Mejia not to behave that way toward Walesca again.

62.     Despite Richard's efforts, over the next week Mr. Mejia asked Walesca to have sex with him or to come to his room at night about six more times.

63.     About three of those times, Mr. Mejia spoke to Walesca at work, either at her workstation on the second floor of the Worcester Factory or while she was outside on a break.

64.     About three of those times, Mr. Mejia spoke to Walesca in the kitchen at the Worcester Dormitory, after the workday.

65.     Just about every time Mr. Mejia had a chance to speak to Walesca alone, he made an unwelcome sexual advance toward her.

66.     Walesca attempted to be calm when rejecting Mr. Mejia's advances, but as he became more and more persistent she got more upset.

67.     Mr. Mejia also opened the door to the room Walesca was sleeping in without knocking a few more times.

68.     It was clear to Walesca that Mr. Mejia was either trying to intimidate her into acquiescing to his demands or trying to make her feel uncomfortable and afraid for rejecting him.

69.     Mr. Mejia's behavior was extremely offensive to Walesca and made her fearful and angry.

70.     Walesca related these incidents to Richard as they occurred.

71.     Walesca felt even more vulnerable and afraid because she knew Mr. Mejia was openly targeting other women too. It was clear to Walesca and Richard that Mr. Mejia felt he could harass women in the Worcester dormitory with impunity.

## DEFENDANT MEJIA HARASSED OTHER WOMEN AT THE WORCESTER DORMITORY

72.     On November 2, 2018, shortly before Mr. Mejia began sexually harassing Walesca, three other women arrived at the housing facility. To the best of Walesca and Richard's recollections, these women's names were Karen, Brenda, and Janira.

73.     When Karen, Brenda, and Janira arrived, they were placed in a room with several other men.

74.     The next morning, Mr. Mejia told Richard that the women were beautiful and that he wanted one of them for himself.

75.     Mr. Mejia pressured Richard to help him begin a sexual relationship with the women.

76.     Richard told Mr. Mejia he would not help him and that he was not that kind of man.

77.     Mr. Mejia made similar comments to Richard almost every day. Richard continued to oppose Mr. Mejia's proposal that he help Mr. Mejia proposition and sexually harass Karen, Brenda, and Janira.

78.     Shortly thereafter, Richard reported Mr. Mejia's sexually harassing conduct to Ms. Mejia-Bouchard.

79.     Ms. Mejia-Bouchard neither acted nor took any corrective action based on Mr. Rivera's reports. To the contrary, Ms. Mejia-Bouchard dismissed Richard's report by commenting that she "already knew about [Mr. Mejia's] behavior and that because of his drinking and unfaithfulness their marriage had suffered" and they had separated.

80.     Later in the same day Richard made this report, Mr. Mejia offered to pay Richard more if he would help him get Karen, Brenda, or Janira have sex with him.

81.     Richard refused.

82. Richard related Mr. Mejia's attempts to recruit him to Walesca as they occurred.

83. Walesca also witnessed Mr. Mejia make sexual comments to Karen and Brenda on several occasions between November 3 and November 10.

## MR. MEJIA ASSAULTS KAREN

84. On the evening of Saturday, November 10, Mr. Mejia came into the kitchen, where several Worcester Wreaths workers were congregated, and began aggressively pressuring Karen to have sex with him.

85. Mr. Mejia appeared to Walesca and Richard to be inebriated.

86. When Karen opposed Mr. Mejia's advances, he grabbed her hair threateningly. Karen told Mr. Mejia not to touch her. Mr. Mejia ignored her and grabbed her by the arm repeatedly. Karen started crying and was obviously distraught and afraid.

87. Karen, Brenda, and Janira came to Walesca's room and told her what happened. They locked the door behind them so Mr. Mejia would not be able to reach them.

88. Mr. Mejia came to the room and knocked on the door. He insisted that the women come out and talk to him. The four of them refused to open the door.

89. After a while, when it appeared that Mr. Mejia had left, they opened the door and Karen, Brenda, Walesca and Janira went to Richard and Miguel to tell them what happened.

90. At Richard and Miguel's suggestion, Karen, Brenda, Walesca and Janira went into a second, smaller room off the main dorm room with Richard and Miguel and locked the door, so that Richard and Miguel could protect the women if Mr. Mejia tried to assault any of them again.

91. Mr. Mejia found them and again tried to convince them to come out. When they refused, Mr. Mejia started fidgeting with the doorknob, in an apparent attempt to force his way inside.

92.     Richard told Mr. Mejia that he would call security unless Mr. Mejia left them alone.

93.     Concerned for Karen, Brenda, Walesca and Janira's safety, Richard and Miguel stayed up all night to make sure Mr. Mejia did not try to force his way inside.

94.     Over the course of this night Richard was scared for his own safety and the safety of Karen, Brenda, Walesca and Janira. Richard believed that Mr. Mejia would once again get violent.

## WALESCA AND RICHARD ARE FIRED AND EVICTED WITHOUT NOTICE

95.     Mrs. Mejia-Bouchard arrived at the dorm the next morning and fired Richard, Walesca, Miguel, Karen, Brenda and Janira.

96.     Shortly thereafter, around 9-10 a.m., Ms. Ahrens, representative for and employee of the Worcester Defendants at the Worcester Dormitory, arrived.

97.     Mr. Mejia communicated with Richard to arrange a conversation about the incident involving Karen. Mr. Mejia unequivocally asked Richard to lie about what had happened. In no uncertain words, Mr. Mejia offered money to Richard to engage him into a re-telling of the facts that would make Mr. Mejia appear as the victim of the incident and the women involved as being "problematic." When Richard refused said offer, Mr. Mejia threatened that he would get Richard fired if he continued to refuse to help him.

98.     Ms. Ahrens argued with Richard and Walesca about the condition of the dorm. Ms. Ahrens told Richard and Walesca that Mr. Mejia had told her that Richard and Walesca and the other women in the dorm had been having sex and drinking there. Richard repeated to Ms. Ahrens and Ms. Mejia-Bouchard that Mr. Mejia had been entering Walesca's room without knocking and that he had been accosting Walesca and Karen.

99. At that point, Ms. Mejia-Bouchard admitted to Ms. Ahrens that Mr. Mejia acted that way when he drank. Upon hearing said statement, Ms. Ahrens walked away with Ms. Mejia-Bouchard and a woman who did the housekeeping following behind her. They spoke away from Richard and Walesca.

100. When Ms. Ahrens returned, Richard and Walesca asked for the opportunity to speak to Mr. Morrill Worcester. Ms. Ahrens then became very upset with Richard and Walesca. Ultimately, Ms. Ahrens yelled, "Get out!" and told Richard, Walesca, and the others they had two hours to leave the premises.

101. None of the workers had anywhere else to stay. Ms. Ahrens threatened that if they did not leave in two hours, she would have Worcester Wreaths' security guards physically remove them.

102. Ms. Ahrens claimed to be forcibly evicting Richard, Walesca, and the others because they broke Worcester Wreaths' rules.

103. Richard, Walesca, and others explained to Ms. Ahrens that Mr. Mejia had physically assaulted Karen, sexually harassed Walesca, Karen, Brenda, and Janira, and that Richard and Miguel had slept in the same room as Walesca, Karen, Brenda, and Janira to protect them from Mr. Mejia, and that if she had heard otherwise from Mr. Mejia, Mr. Mejia's account was false.

104. Ms. Ahrens refused to listen, and told Richard and Walesca that they had to leave the premises and that they were fired from their jobs at Worcester Wreaths.

105. Faced with being physically removed from the property, Richard, Walesca, and the others had no choice but to leave, despite not having anywhere to go.

106. At no point did Ms. Ahrens, Mr. Mejia, Ms. Mejia-Bouchard or any other representative of Worcester Wreaths provide Walesca, Richard, or the others of notice required under 14 M.R.S. § 6001(1-B) and § 6002 before the forcible removal of a tenant from a tenancy or inform them that they had the right to remain for at least seven days.

107. Walesca and Richard were able to get rides into town with Mano en Mano, a non-profit organization that works with migrant laborers. Mano en Mano paid for the workers to stay in hotel rooms.

108. Without Mano en Mano's help, Walesca, Richard and the other workers would have been homeless.

## THE WORCESTER DEFENDANTS MEET WITH WALESCA AND RICHARD

109. Mano en Mano alerted the Maine Department of Labor to the situation. Maine Department of Labor representative Jorge Acero called Morrill Worcester, the owner of Worcester Wreaths, to discuss the issue.

110. Mr. Worcester told Mr. Acero that he had known Brianna Mejia-Bouchard for a long time, that she told him that Mr. Mejia would never have engaged in the conduct he was accused of, and that he believed her word over the word of workers he had not met.

111. Mano en Mano and the Maine Department of Labor arranged a meeting between Walesca and Richard and Mr. Worcester and Ms. Ahrens on Thursday, November 15.

112. At the meeting, Ms. Ahrens told Walesca, Richard that they and the others had been fired and evicted for breaking Worcester Wreaths' housing rules, which prohibited men and women from sleeping in the same room and prohibited all tenants from drinking alcohol.

113.    However as noted above, when Walesca arrived at the Worcester Dormitory she was placed in a common dorm room with several men. Ms. Ahrens then personally approved her transfer to another, smaller room, with two other men, Richard and Miguel.

114.    As described above, when Karen, Brenda, and Janira arrived at the Worcester Dormitory, they were placed in a room with other men.

115.    Both workers and supervisors, including Mr. Mejia, routinely drank alcohol on the premises of the housing facility. Worcester Wreaths tolerated drinking by tenants at the housing facility until Walesca, Richard, and others opposed and reported Mr. Mejia's illegal sexual harassment, assault, and retaliation.

### THE WORCESTER ENTERPRISE

116.    Defendants Worcester Wreaths, Worcester Holdings, Worcester Resources, Mr. Mejia and Ms. Mejia-Bouchard are together involved in a singular operation to grow trees that provide balsam tips, collect balsam tips and manufacture and box wreaths for shipment (the "Worcester Enterprise").

117.    This entire operation was formerly housed and managed in a single corporation: Worcester Wreaths. Worcester Wreaths has subsequently spun off different aspects of the operation to different corporations, including hiring what it asserts are independent contractors to complete some of the work.

118.    Worcester Wreaths was incorporated in 2000 with Mr. Morrill Worcester identified as the sole incorporator and Mr. Morrill Worcester, Ms. Karen Worcester and Ms. Pamela Worcester identified as initial directors. As of Worcester Wreath's 2021 annual report to the Maine Secretary of State, Mr. Morrill Worcester is the treasurer and president of Worcester Wreath.

119.    Worcester Holdings was incorporated in 2000 with Mr. Morrill Worcester and Ms. Karen Worcester identified as organizers and Mr. Morrill Worcester identified as the sole manager. As of Worcester Holdings' 2021 annual report to the Maine Secretary of State, Mr. Morrill Worcester is Worcester Holdings' sole member, manager or authorized person.

120.    Worcester Resources was incorporated in 2005 with a single incorporator, Mr. Morrill Worcester. As of Worcester Resources' 2021 annual report to the Maine Secretary of State, Ms. Sarah Worcester is the treasurer, Mr. Michael J. Worcester is the vice-president and Mr. Morrill Worcester is the president.

121.    Regardless of how the Worcester Enterprise is structured, the organization and purpose of the Worcester Enterprise now remains the same as it was back when it was operated and managed entirely by just Defendant Worcester Wreaths.

122.    As part of the Worcester Enterprise, Worcester Holdings grows trees that provides the balsam tips that are used in wreath making. Further, Worcester Holdings owns the factories and housing where employees of Worcester Resources reside while they are working. Worcester Resources misclassifies most of its employees who work in its wreath-making factories as employees of independent contractors even though their work is strictly controlled by the Worcester Defendants.

123.    Including the workers it classifies as employees and the workers it identifies as employed by independent contractors, the Worcester Enterprise employs approximately 800 individuals.

124.    The Worcester Enterprise purports to hire independent contractor agencies who then hire workers that cut and collect balsam tips and manufacture and box wreaths.

125.    These misclassified independent contractors do the same jobs as the workers classified as "employees" and that they would have done when working directly for Defendant Worcester Wreath in the past.

126.    These purported independent contractor agencies, like the Mejias, are under the operational control of the Worcester Defendants.

127.    The individual workers, regardless of whether they are directly employed by the Worcester Enterprise or misclassified independent contractors, are under the ultimate supervision of the President of Worcester Wreath, Morrill Worcester.

128.    Many of the workers in the Worcester Enterprises' factory are further directly supervised by employees and managers of Worcester Resources and/or Worcester Holdings. For example and as noted below, Walesca was directed in how to do her job assembling boxes to hold completed wreaths by Mr. Morrill Worcester's son, who is directly employed by Worcester Enterprises.

129.    The wreath production season is approximately 35 days. Mr. Morrill Worcester is on-site in the production warehouse for this entire period and available to address the complaints and needs of those working in the factory, regardless of whether they are misclassified independent contractors.

130.    Mr. Morrill Worcester, on behalf of the Worcester Defendants, directed the Mejias in setting the schedule and tasks of those ostensibly employed by the Mejias, including Walesca and Richard.

### THE WORSTER DEFENDANTS AND THE MEJIAS JOINTLY EMPLOYED WALESCA AND RICHARD

131.    The Worcester Defendants and the Mejias jointly employed Walesca and Richard to work at the Worcester Factory.

132.    Despite Walesca and Richard being ostensibly employed by the Mejias, the Worcester Defendants retained the ability to set Walesca and Richard's schedule.

133.    This is evidenced by the fact that Mr. Morrill Worcester, on behalf of the Worcester Defendants, directed the Mejias in setting the schedule and tasks of those ostensibly employed by the Mejias, including Walesca and Richard.

134.    Further, the Worcester Defendants controlled the scheduling of all workers in the Worcester Factory, including Walesca and Richard, regardless of whether they were ostensibly employed by the Worcester Defendants or another contractor.

135.    The Worcester Defendants controlled the conditions of employment of all workers working in and around the Worcester Factory, including Walesca and Richard.

136.    This control is evidenced by the fact that the Worcester Defendants owned and operated the Worcester Factory, and further provided all tools and other items necessary for those working in the Worcester Factory to complete their jobs, including Walesca and Richard, regardless of what entity ostensibly employed them.

137.    The Worcester Defendants had ultimate supervisory authority over the work completed by Walesca and Richard.

138.    To wit, upon her arrival at the Worcester Factory, Walesca was shown how to complete her work by the son of Mr. Morrill Worcester, the owner of Worcester Wreaths.

139.    The Worcester Defendants set goals and procedures for work completed by those working in and around the Worcester Factory, including Walesca and Richard.

140.    The Worcester Defendants retained the ability to ultimately address any disputes or complaints from employees working in and around the Worcester Factory, including Walesca and Richard.

## THE MEJIAS WERE THE OSTENSIBLE AGENTS OF THE WORCESTER DEFENDANTS

141.    The Mejias were the ostensible agents of the Worcester Defendants with regards to the employment of Walesca and Richard.

142.    At all relevant times, Walesca and Richard were of the belief that they were employed by the Worcester Defendants, specifically Defendant Worcester Wreaths.

143.    Walesca and Richard's belief was reasonable based on, among other things, the representations of the Mejias, the fact that they were being housed by the Worcester Defendants and subject to housing rules promulgated by the Worcester Defendants, that they were working in the Worcester Factory surrounded by individuals working approximately the same schedule who were working directly for the Worcester Defendants.

144.    The Mejias, acting on behalf of the Worcester Defendants recruited individuals, including Walesca and Richard, to work in and around the Worcester Factory.

145.    Upon information and belief, the Mejias worked solely for the Worcester Defendants recruiting and ostensibly employing individuals to work in and around the Worcester Factory.

146.    The obligations and restrictions imposed by the Worcester Defendants with regard to the jobs to completed by the ostensible employees of the Mejias were such that the Mejias did not have effective managerial control over their ostensible employees, including Walesca and Richard.

147.    The Worcester Defendants controlled the time and manner of the work completed by those working in and around the Worcester Factory, including Walesca and Richard.

148.    The Worcester Defendants set goals and procedures for work completed by those working in and around the Worcester Factory, including Walesca and Richard.

149.    The Worcester Defendants provided all materials, tools or other necessary instruments used by those working in and around the Worcester Factory, including Walesca and Richard.

150.    The Worcester Defendants retained the ultimate authority to hear and resolve complaints or disputes from those working in and around the Worcester Factory, including Walesca and Richard.

### THE MEJIAS WERE THE AGENTS OF THE WORCESTER DEFENDANTS

151.    The Mejias, acting as apparent and/or actual agents of the Worcester Defendants, employed Walesca and Richard.

152.    Upon information and belief, the Worcester Defendants granted and/or knowingly permitted the Mejias to act on their behalf in recruiting, training, supervising and managing the housing of, among others, Walesca and Richard.

153.    Upon information and belief, the Worcester Defendants granted and or knowingly permitted the Mejias the authority to, in their name, staff the Worcester Factory with workers in order to produce wreaths.

154.    At all relevant times, Walesca and Richard were of the belief that they were employed by the Worcester Defendants, specifically Defendant Worcester Wreaths.

155.    Walesca and Richard's belief was reasonable based on, among other things, the representations of the Mejias, the fact that they were being housed by the Worcester Defendants and subject to housing rules promulgated by the Worcester Defendants, that they were working in the Worcester Factory surrounded by individuals working approximately the same schedule who were working directly for the Worcester Defendants.

156.   The Worcester Defendants granted the Mejias some authority over the workers employed in the Worcester Factory. However, in order to ensure the efficient production of wreaths, the Worcester Defendants retained ultimate control over the scheduling of workers, as evidenced by Mr. Worcester's dictation of Walesca and Richard's schedules and the maintenance of its own supervisors at the Worcester Factory.

## ADMINISTRATIVE PROCEDURE

157.   On June 27, 2019, Richard and Walesca filed complaints against Worcester Wreath with the MHRC, EEOC, and the Department of Housing and Urban Development (HUD) alleging discrimination in housing and employment.

158.   On February 6, 2020, Richard filed an amended complaint adding Worcester Holdings, Worcester Resources, Damien Mejia and Brianna Mejia-Bouchard to her previously filed complaint.

159.   On August 20, 2020, Walesca filed an amended complaint adding Worcester Holdings, Worcester Resources, Damien Mejia and Brianna Mejia-Bouchard to her previously filed complaint.

160.   MHRC procedural rules specify that a charging party may file an amended complaint to assert an additional claim of discrimination based upon the same facts and that the amendment will relate back to the original filing to determine if the amendment is timely.

161.   On May 4, 2021 the MHRC investigator issued an investigator's report in the matter of Walesca Rodriguez v. Worcester Wreath Company, Worcester Resources, LLC, Worcester Holdings, LLC, Damien Mejia and Brianna Mejia-Bouchard. The report recommended that the commission issue a reasonable grounds finding that: (i) Brianna Mejia-Bouchard discriminated against Walesca on the basis of sex when she was subjected to a hostile work environment and

discharged her from employment; (ii) Brianna Mejia-Bouchard unlawfully retaliated against Walesca in violation of the WPA and/or the MHRA; (iii) that Damien Mejia unlawfully interfered with Walesca's MHRA-protected rights in violation of the MHRA. The report further recommended that the commission issue a no reasonable grounds finding that Worcester Wreath Company, Worcester Resources, LLC and/or Worcester Holdings, LLC discriminated against Walesca Rodriguez in housing on the basis of sex, sexual orientation, race, national origin and/or ancestry.

162.    On June 14, 2021, the MHRC voted to issue reasonable grounds and no reasonable grounds findings in Walesca's matter accordance with the recommendations described above, respectively. However, two of the five MHRC commissioners voted to find there was reasonable grounds that Worcester Wreath Company, Worcester Resources, LLC and/or Worcester Holdings, LLC discriminated against Walesca Rodriguez in housing in opposition to the recommendations in the investigator's report.

163.    On May 7, 2021 the MHRC investigator issued an investigator's report in the matter of Richard Rivera v. Worcester Wreath Company, Worcester Resources, LLC, Worcester Holdings, LLC, Damien Mejia and Brianna Mejia-Bouchard. The report recommended that the commission issue a reasonable grounds finding that: (i) Damien Mejia unlawfully interfered with Richard Rivera's MHRA-protected rights in violation of the MHRA; and (ii) Brianna Mejia-Bouchard unlawfully retaliated against Richard Rivera in violation of the WPA and the MHRA.

164.    On June 14, 2021, the MHRC voted to issue reasonable grounds findings in accordance with the recommendations of the investigator's report.

165.    On June 14, 2021, the MHRC dismissed both Walesca Rodriguez and Richard Rivera's matters against Worcester Wreath Company, Worchester Holdings, LLC and Worcester Resources, LLC.

166.    On September 2, 2021, the EEOC dismissed both Walesca Rodriguez and Richard Rivera's matters against Worcester Wreath Company.

167.    Under 5 M.R.S. § 4622, Walesca has satisfied one or more of the prerequisites to be awarded attorneys' fees and all available damages under the Maine Human Rights Act and the Maine Whistleblowers' Protection Act.

168.    Under 5 M.R.S. § 4622, Richard has satisfied one or more of the prerequisites to be awarded attorneys' fees and all available damages under the Maine Human Rights Act and the Maine Whistleblowers' Protection Act.

169.    Walesca has exhausted all administrative remedies for all claims in this action that require administrative exhaustion.

## CLAIMS FOR RELIEF

### COUNT I:
### VIOLATION OF TITLE VII & MHRA EMPLOYMENT DISCRIMINATION PROTECTIONS
### ON BEHALF OF WALESCA RODRIGUEZ
### AGAINST ALL DEFENDANTS

170.    The allegations in paragraphs 1-169 are realleged.

171.    The Worcester Defendants employed Walesca Rodriguez by virtue of being either together a single integrated enterprise or otherwise acting as joint employer with the Mejias.

172.    Alternatively, the Mejias were at all times relevant to this action acting as agents, actual, implied, apparent or ostensible, for the Worcester Defendants.

173. Defendants intentionally discriminated against Walesca Rodriguez because of her sex by allowing Damien Mejia to continuously harass and demean her despite repeated notices of Mr. Mejia's conduct. This harassment culminated in her termination and unlawful eviction in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* and 5 M.R.S. §§ 4571 & 4572.

174. Walesca Rodriguez repeatedly complained to Defendants about Mr. Mejia's conduct and Defendants had actual or constructive knowledge of Mr. Mejia's objectively hostile ongoing discrimination and harassment.

175. As a direct and proximate result of Defendants' intentional discrimination, interference, retaliation and eviction, Walesca and Richard have suffered and will continue to suffer damages, including, but not limited to, back pay, loss of self-confidence and self-respect, humiliation and embarrassment, emotional pain and distress, suffering, inconvenience, mental anguish, loss of enjoyment of their jobs and their life, injury to reputation, and other pecuniary and non-pecuniary losses.

176. Defendants, acting in concert as the Worcester Enterprise, failed to take prompt and appropriate remedial action to prevent or correct further discrimination and harassment.

**COUNT II:**
**VIOLATION TITLE VII**
**42 U.S.C. § 2000e *et seq.***
**ON BEHALF OF WALESCA RODRIGUEZ & RICHARD RIVERA**
**AGAINST ALL DEFENDANTS**

177. The allegations in paragraphs 1-176 are realleged.

178. The Worcester Defendants employed Walesca Rodriguez and Richard Rivera by virtue of being either together a single integrated enterprise or otherwise acting as joint employer with the Mejias.

179.    Alternatively, the Mejias were at all times relevant to this action acting as agents, actual, implied, apparent or ostensible, for the Worcester Defendants.

180.    Defendants housed Plaintiffs Walesca Rodriguez and Richard Rivera in the Worcester Dormitory.

181.    Defendants intentionally retaliated against Richard Rivera and Walesca Rodriguez for reporting the illegal conduct of Damien Mejia, conduct they reasonably believed was unlawful, for opposing Mr. Mejia's illegal conduct, and interfered with his right to work and live in an environment free from sexual harassment and to not be discharged and evicted for reporting Mr. Mejia's sexual harassment violation of Title VII,

182.    The effect of the events described above has been to deprive Walesca Rodriguez and Richard Rivera of equal employment opportunities in retaliation for exercising their federally protected rights.

183.    As a direct and proximate result of Defendants' intentional discrimination, interference, retaliation and eviction, Walesca and Richard have suffered and will continue to suffer damages, including, but not limited to, back pay, loss of self-confidence and self-respect, humiliation and embarrassment, emotional pain and distress, suffering, inconvenience, mental anguish, loss of enjoyment of their jobs and their life, injury to reputation, and other pecuniary and non-pecuniary losses.

184.    The unlawful employment practices described above were done with malic or with reckless indifference to the federally protected rights of Walesca Rodriguez and Richard Rivera.

## COUNT III:
## VIOLATION OF THE FAIR HOUSING ACT
### 42 U.S.C. §§ 3604(b), 3617
### ON BEHALF OF WALESCA RODRIGUEZ AND RICHARD RIVERA
### AGAINST ALL DEFENDANTS

185.    The allegations in paragraphs 1-184 are realleged.

186.    The Worcester Defendants employed Walesca Rodriguez and Richard Rivera by virtue of being either a single integrated enterprise or otherwise acting as joint employer with the Mejias.

187.    Alternatively, the Mejias were at all times relevant to this action acting as agents, actual, implied, apparent or ostensible, for the Worcester Defendants.

188.    The Worcester Defendants owned the Worcester Dormitory where Walesca Rodriguez and Ricard Rivera were housed.

189.    Defendants intentionally retaliated against Richard Rivera and Walesca Rodriguez for reporting the illegal conduct of Damien Mejia, conduct they each reasonably believed was unlawful, for opposing Mr. Mejia's illegal conduct, and interfered with their right live in an environment free from sexual harassment when they evicted them from their housing for reporting Mr. Mejia's sexual harassment.

190.    Plaintiffs are aggrieved persons as defined by the Fair Housing Act, 42 U.S.C. § 3602(i), and as a direct and proximate result of Defendants' unlawful discriminatory conduct and retaliation have sustained damages.

191.    As a direct and proximate result of Defendants' intentional discrimination, interference, retaliation and eviction, Walesca and Richard have suffered and will continue to suffer damages, including, but not limited to, back pay, loss of self-confidence and self-respect, humiliation and embarrassment, emotional pain and distress, suffering, inconvenience, mental

anguish, loss of enjoyment of their jobs and their life, injury to reputation, and other pecuniary and non-pecuniary losses.

192.     Accordingly, under 42 U.S.C. § 3613(c), Plaintiffs are entitled to actual damages, punitive damages, injunctive relief, and reasonable attorneys' fees and costs.

### COUNT IV:
### VIOLATION OF THE MHRA HOUSING PROVISIONS & ILLEGAL EVICTION
### 5 M.R.S. § 4581-A(1) & 14 M.R.S. § 6001(1-B) and § 6002
### ON BEHALF OF WALESCA RODRIGUEZ AND RICHARD RIVERA
### AGAINST ALL DEFENDANTS

193.     The allegations in paragraphs 1-192 are realleged.

194.     The Worcester Defendants employed Walesca Rodriguez and Richard Rivera by virtue of being either a single integrated enterprise or otherwise acting as joint employer with the Mejias.

195.     Alternatively, the Mejias were at all times relevant to this action acting as agents, actual, implied, apparent or ostensible, for the Worcester Defendants.

196.     The Worcester Defendants owned the Worcester Dormitory where Plaintiffs Walesca Rodriguez and Richard Rivera were housed.

197.     Neither Defendants nor any representative of Defendants provided Walesca Rodriguez or Richard Rivera notice required under 14 M.R.S. § 6001(1-B) and § 6002 before the forcible removal of a tenant from a tenancy or inform Plaintiffs that they had the right to remain for at least seven days.

198.     Defendants intentionally retaliated against Richard Rivera and Walesca Rodriguez for reporting the illegal conduct of Damien Mejia, conduct they each reasonably believed was unlawful, for opposing Mr. Mejia's illegal conduct, and interfered with their right live in an

environment free from sexual harassment when they illegally evicted them from their housing for reporting Mr. Mejia's sexual harassment in violation of 5 M.R.S. §§ 4581-A(D) & (E).

199.    As a direct and proximate result of Defendants' intentional discrimination, interference, retaliation and eviction, Walesca and Richard have suffered and will continue to suffer damages, including, but not limited to, back pay, loss of self-confidence and self-respect, humiliation and embarrassment, emotional pain and distress, suffering, inconvenience, mental anguish, loss of enjoyment of their jobs and their life, injury to reputation, and other pecuniary and non-pecuniary losses.

200.    Accordingly, under 5 M.R.S. §§ 4613(2)(B)(7), (9) & 4614 and 14 M.R.S. § 6014 Plaintiffs are entitled to actual damages, punitive damages, injunctive relief, and reasonable attorneys' fees and costs.

### COUNT V:
### VIOLATION OF THE MHRA RETALIATION / INTERFERENCE PROVISIONS
### 5 M.R.S. § 4633
### ON BEHALF OF WALESCA RODRIGUEZ AND RICHARD RIVERA
### AGAINST ALL DEFENDANTS

201.    The allegations in paragraphs 1-200 are realleged.

202.    The Worcester Defendants employed Walesca Rodriguez and Richard Rivera by virtue of being either a single integrated enterprise or otherwise acting as joint employer with the Mejias.

203.    Alternatively, the Mejias were at all times relevant to this action acting as agents, actual, implied, apparent or ostensible, for the Worcester Defendants.

204.    The Worcester Defendants owned the Worcester Dormitory where Plaintiffs Walesca Rodriguez and Richard Rivera were housed.

205.    The Worcester Defendants each individually and collectively constitute a "person" pursuant to 5 M.R.S. § 4633.

206.    Defendants intentionally retaliated against Richard Rivera and Walesca Rodriguez for reporting the illegal conduct of Damien Mejia, conduct they each reasonably believed was unlawful, for opposing Mr. Mejia's illegal conduct, and interfered with their right live in an environment free from sexual harassment when they terminated and evicted them from their housing for reporting Mr. Mejia's sexual harassment in violation of 5 M.R.S. § 4633.

207.    As a direct and proximate result of Defendants' intentional discrimination, interference, retaliation and eviction, Walesca and Richard have suffered and will continue to suffer damages, including, but not limited to, back pay, loss of self-confidence and self-respect, humiliation and embarrassment, emotional pain and distress, suffering, inconvenience, mental anguish, loss of enjoyment of their jobs and their life, injury to reputation, and other pecuniary and non-pecuniary losses.

208.    Accordingly, under 5 M.R.S. §§ 4613(2)(B)(7) & 4614, Plaintiffs are entitled to actual damages, punitive damages, injunctive relief, and reasonable attorneys' fees and costs.

**COUNT VI:**
**VIOLATION OF THE MAINE WHISTLEBLOWERS' PROTECTION ACT**
**26 M.R.S. § 833**
**ON BEHALF OF WALESCA RODRIGUEZ AND RICHARD RIVERA**
**AGAINST ALL DEFENDANTS**

209.    The allegations in paragraphs 1-208 are realleged.

210.    The Worcester Defendants employed Walesca Rodriguez and Richard Rivera by virtue of being either a single integrated enterprise or otherwise acting as joint employer with the Mejias.

211.    Alternatively, the Mejias were at all times relevant to this action acting as agents, actual, implied, apparent or ostensible, for the Worcester Defendants.

212.    The Worcester Defendants are the employers of Walesca Rodriguez and Richard Rivera, and Plaintiffs are employees of the Worcester Defendants as those terms are defined under 26 M.R.S. § 832.

213.    Defendants employed Plaintiffs Walesca Rodriguez and Richard Rivera in the Worcester Factory.

214.    Defendants housed Plaintiffs Walesca Rodriguez and Richard Rivera in the Worcester Dormitory.

215.    Walesca Rodriguez and Richard Rivera engaged in protected activity within the meaning of the Maine Whistleblower Protection Act by making complaints of illegal practices by Mr. Mejia to Defendants acting in concert as members of the Worcester Enterprise, including Ms. Mejia-Bouchard.

216.    Walesca Rodriguez and Richard Rivera each had a reasonable basis for believing that the conduct of Mr. Mejia in sexually harassing Walesca and other women in the Worcester Dormitory and at the Worcester Factory was illegal.

217.    Walesca Rodriguez and Richard Rivera engaged in the aforementioned activity in good faith.

218.    As a direct and proximate cause of Walesca and Richard's reporting of Mr. Mejia's conduct, they were terminated and evicted by Defendants.

219.    As a direct and proximate result of Defendants' intentional discrimination, interference, retaliation and eviction, Walesca and Richard have suffered and will continue to suffer damages, including, but not limited to, back pay, loss of self-confidence and self-respect,

humiliation and embarrassment, emotional pain and distress, suffering, inconvenience, mental anguish, loss of enjoyment of their jobs and their life, injury to reputation, and other pecuniary and non-pecuniary losses.

220.    As a result of Defendants' conduct, Walesca and Richard have suffered and are entitled to damages, including but not limited to lost wages and benefits, front pay, compensatory damages including emotional pain and suffering and lost enjoyment of life, civil penal damages, attorneys' fees, costs and expenses.

<u>**PRAYER FOR RELIEF**</u>

WHEREFORE, Plaintiffs request relief against Defendants as follows:

a.    Enter declaratory relief that Defendants violated Walesca and Richard's statutory and constitutional civil rights to be free of sex discrimination, unlawful eviction and unlawful retaliation;

b.    Enter injunctive relief ordering Defendants to:

i.    provide effective civil rights training for all human resources employees, supervisors and dormitory managers (regardless of their status as employees or ostensible independent contractors) on the requirements of all applicable laws prohibiting employment discrimination because of sex and complete this training within 60 days of the entry of Judgment for Injunctive Relief;

ii.    provide this training for two years after the date judgment is entered to all new human resources employees, supervisors and dormitory managers (regardless of their status as employees or ostensible

independent contractors) within 60 days of their starting their position;

    iii.    maintain attendance sheets or records signifying attendance identifying each person who attended each training session and forward a copy of the attendance sheets to Plaintiff's counsel within seven days of each training session;

    iv.    post at the worksite and all dormitories a copy of a remedial notice detailing the judgment in this case as well as the order providing injunctive relief; and

    v.    send a letter printed on Defendants' letterhead to all of Defendants' employees and independent contractors advising them of the judgment in this case, enclosing a copy of their policies regarding anti-discrimination and retaliation, and stating that they will not tolerate any such discrimination or retaliation, and will take appropriate disciplinary action against any employee, agent or contractor of Defendants who engages in such discrimination.

c.    Award back pay for lost wages and benefits;

d.    Award as liquidated damages an amount equal to twice the amount of unpaid wages and benefits;

e.    Award compensatory damages in amounts to be determined at trial by the jury or nominal damages;

f.    Award actual damages in amounts to be determined at trial by the jury, or nominal damages;

g.      Award punitive damages in amounts to be determined at trial by the jury;

h.      Award Plaintiff full costs and reasonable attorney's fees;

i.      Award pre-judgment interest; and

j.      Award such further relief as is deemed appropriate.


Dated: September 10, 2021

                                        Respectfully Submitted,

                                        ___/s/ Peter Mancuso_____
                                        Peter Mancuso, Esq.
                                        Andrew Schmidt Law, PLLC
                                        97 India St.
                                        Portland, Maine 04101
                                        peter@maineworkerjustice.com
                                        (207) 619-0884

                                        *Attorneys for Plaintiffs*